**FILED**
**Sep 14, 2023**
**04:27 PM(ET)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT KNOXVILLE

| | |
|---|---|
| **RAYMOND PRIDGEN,** <br> Employee, <br> **v.** <br> **TEXAS ROADHOUSE,** <br> Employer, <br> And <br> **HARTFORD ACCIDENT &** <br> **INDEMNITY COMPANY,** <br> Carrier. | ) Docket No. 2020-03-0904 <br> ) <br> ) <br> ) State File No. 57394-2019 <br> ) <br> ) <br> ) Judge Pamela B. Johnson <br> ) <br> ) <br> ) |

## COMPENSATION ORDER

The Court held a Compensation Hearing on August 9, 2023, to determine whether Mr. Pridgen's fall and resulting injuries arose primarily out of and in the course and scope of his employment. If so, the Court must determine the degree of medical impairment and resulting permanent disability.

Mr. Pridgen argued his fall at work caused permanent total disability. Texas Roadhouse denies that the injury arose out of and in the course and scope of employment, but if it did, Mr. Pridgen is not permanently and totally disabled due to the work injury.

Based on the preponderance of the evidence, the Court holds that Mr. Pridgen's injuries arose primarily out of and in the course and scope of his employment, resulting in a seven-percent permanent impairment. The Court concludes Mr. Pridgen is permanently and totally disabled, considering his medical impairment, work skills, age, education, training, and job opportunities in the local labor market.

### History of Claim

On July 22, 2019, Mr. Pridgen was smoking in the designated area at Texas Roadhouse, when a possum suddenly ran from behind a nearby dumpster and startled him.

1

Mr. Pridgen slipped and fell as he tried to get away, injuring his right shoulder.[1]

The parties agreed that Texas Roadhouse paid him temporary disability benefits at the rate of $311.38 from July 22, 2019, to February 25, 2022, totaling $46,551.31. It also authorized medical treatment with Dr. Matthew Rappe and paid medical expenses of $49,167.92. Mr. Pridgen had not returned to work for Texas Roadhouse, earning the same or greater wages as he was earning before the injury.

The threshold dispute was whether Mr. Pridgen's injuries arose out of and in the course and scope of his employment. The parties offered conflicting testimony as to whether Mr. Pridgen was "on the clock" when he slipped and fell.

*The Incident*

Mr. Pridgen testified that he went outside at the end of his shift to smoke and wait for his ride. He acknowledged that his timecard showed that he clocked out at exactly 11:00 p.m. He was uncertain whether he clocked himself out, but he was "pretty sure" that he worked past 11:00. If the end of duty report was running, he could not clock out, so a manager would clock him out. He said it was odd that his time was exactly 11:00 p.m. because his clocked times were not usually exact but one or two minutes before or after his start and end times. He did not know the exact time of his fall.

Mr. Pridgen informed Texas Roadhouse when he was hired that he did not have a license. His sons drove him to and from work. On the date of his injury, he could not recall whether he had called his son to pick him up before the incident.

Janie Lay, a kitchen manager for Texas Roadhouse, stated Mr. Pridgen fell in the dock area after he finished his shift and clocked out. She agreed that Mr. Pridgen's timecard showed he clocked out at 11:00 p.m. She said the computer program will show whether Mr. Pridgen or a manager clocked him out, but the printed timecard will not. She admitted that she did not know whether he or a manager clocked him out by the printed timecard alone. She also testified that she completed a first report of work injury and wrote the time of injury was 11:40 p.m. based on a video she reviewed.[2]

The parties agreed that employees may smoke in the designated area, and employees waiting for rides after shift were not uncommon occurrences at Texas Roadhouse. Specifically, Mr. Pridgen, Ms. Lay, and coworker Justin Massey testified that Texas

---

[1] Three petitions were filed in this case listing three dates of injury. The parties agreed the date of injury is July 22, 2019. Two dispute certification notices listed both the right shoulder and back and back only. Mr. Pridgen waived any claim for a back injury because he offered no evidence of it caused by his employment.

[2] Mr. Pridgen requested the video from Texas Roadhouse, but he was never provided the video or given the opportunity to review it.

2

Roadhouse designated a smoking area for employees out back near the dumpsters and grease barrels and allowed smoke breaks before, during, and after employees' shifts. Mr. Massey testified that possums and other small animals were often near the dumpsters and grease barrels.

Mr. Pridgen and Ms. Lay also both testified that Texas Roadhouse employed Mr. Pridgen, knowing that he did not have a driver's license and would be dropped off and picked up for work. Ms. Lay stated that "waiting for rides" was not unusual for several Texas Roadhouse employees.

*Medical impairment*

The parties also disputed the impairment rating for Mr. Pridgen's shoulder. After the injury, he treated with panel-selected physician Dr. Matthew Rappe. The initial MRI revealed a massive rotator cuff tear, and he performed surgery in October 2019. Dr. Rappe placed Mr. Pridgen at maximum medical improvement on June 1, 2020, and assigned a three-percent impairment rating with no permanent restrictions.

After his release, Mr. Pridgen attempted to work briefly for another restaurant but testified he was unable to perform the job functions due to his shoulder pain. He returned to Dr. Rappe in July and reported difficulty with reaching and lifting. Dr. Rappe ordered another MRI that showed a retear of the rotator cuff. Mr. Pridgen underwent a second surgery in September 2020.

The following July, Mr. Pridgen reported weakness with overhead lifting. Dr. Rappe ordered a third MRI, which showed another retear in the rotator cuff. Dr. Rappe discussed a revision surgery, but he and Mr. Pridgen agreed to conservative treatment instead. Dr. Rappe placed Mr. Pridgen at maximum medical improvement a second time on February 25, 2022, and assigned a seven-percent rating with permanent restrictions of no overhead lifting or lifting more than five pounds.

Texas Roadhouse sent Mr. Pridgen for an employer's examination with Dr. David Hovis in December 2021. Using the range-of-motion tables, Dr. Hovis assigned a six-percent impairment and permanent restrictions of no overhead work or lifting over ten pounds. When asked about the difference in ratings as compared to Dr. Rappe, Dr. Hovis acknowledged that two physicians can reaching differing opinions. He did not explain why Dr. Rappe's rating was incorrect. Dr. Hovis said that a reverse total shoulder replacement could improve Mr. Pridgen's work symptoms, but he would have permanent restrictions with an unlikely return to productive work.

The parties also asked the Medical Impairment Rating Registry for an evaluation, and Dr. Patrick Bolt gave a seven-percent impairment.

3

*Failure to Return to Work*

The parties offered conflicting testimony regarding Mr. Pridgen's failure to return to work at Texas Roadhouse or any job in the open labor market and the extent of his permanent disability.

Mr. Pridgen is fifty years old and lives in Knox County. He testified that he previously worked in the construction industry in both general construction and kitchen/bath installations. He described heavy lifting and climbing requirements for those jobs. He more recently transitioned to the restaurant industry in kitchen management. His job duties included ordering and stocking food, cleaning the kitchen and grills, and preparing food. The lifting requirements ranged from forty to sixty pounds.

Texas Roadhouse hired Mr. Pridgen as a hot prep cook. Each shift, he assessed the work to be done, which included washing produce, preparing potatoes for baking, making salad dressings, and prepping salad toppings. He scrubbed and cleaned the kitchen using both arms.

After the work incident, he tried to return to work at Texas Roadhouse. While cutting vegetables, he experienced swelling in his right hand and arm. After his first surgery, he was unable to raise his right arm overhead.

Mr. Pridgen testified that he contacted Ms. Lay when he was first placed at maximum medical improvement and asked to return to work. She told him that she would call him if any job became available. He testified that he followed up but never heard back.

Ms. Lay acknowledged that Mr. Pridgen asked to return to work and told her that he had restrictions of no use of his right arm. She said he did not give her any paperwork with his restrictions. She admitted that she did not have a job to offer him with the use of one arm only at that time. However, she later testified that had Mr. Pridgen submitted his permanent restrictions, she could have possibly modified a job and accommodated them.

He then went to work at another restaurant for three to four days in June 2020. He said he was hired to make salads, but he could not lift his right arm to get to the lettuce and was unable to chop lettuce. He denied any new injury or re-injury while briefly working at there. In 2021, he tried to work again at yet another restaurant. He only worked three hours before he had to quit because unloading products, preparing food, and chopping became too painful.

Mr. Pridgen now experiences right arm pain, often wears a sling, and uses a Tens unit for pain. He described shoulder pain shooting into his arm. He showed that he cannot move his arm behind his back or above his chest. He has difficulty completing his activities of daily living without assistance. His sons, ages 20 and 16, cook, transfer wet laundry

4

from the washer to the dryer, and clean their home. He cannot lift a gallon of milk and finds sleep difficult. He must use his non-dominant left arm more and now experiences occasional pain in that arm.

In addition to his shoulder injury and overuse of his other arm, Mr. Pridgen testified that he had intermittent back problems before the injury but none at the time of his injury. He also suffered pain in his legs and feet from peripheral neuropathy caused by diabetes. He said he was able to work before his injury with his back pain and problems with his leg and feet. Now, he cannot sit or stand for more than an hour. A few months ago, he suffered a small stroke and now uses a cane.

Mr. Pridgen said he quit high school in tenth grade and later obtained his GED. He briefly attended business school for one semester. He said he cannot use a computer or type except to "peck." He denied any office or clerical experience and has never worked as a cashier.

*Vocational experts' testimony*

Two vocational disability experts offered opinions as to Mr. Pridgen's vocational disability. Dana Stoller testified on Mr. Pridgen's behalf; Michael Galloway testified for Texas Roadhouse. Both hold master's degrees in vocational disability and certifications in rehabilitation counseling. Similarly, both reviewed Mr. Pridgen's medical records, discovery responses, and employment records and met with him to discuss his education and work history, medical history, and current physical limitations.

Ms. Stoller described Mr. Pridgen's relevant past work history, including work as a painter/carpenter, line cook, and kitchen manager. At the time of injury, he worked as a prep cook and was required to lift/carry up to 100 pounds, constantly handle/finger and reach outwards, and frequently reach above his shoulders. He was required to stand throughout his shift and worked in a fast-paced environment. As to post-injury work, Ms. Stoller identified one attempt by Mr. Pridgen to return to work. After three days, he was unable to continue because he was physically unable to perform the job.

Ms. Stoller noted that Mr. Pridgen had no pre-injury physical limitations or restrictions precluding his ability to work. His pre-injury work history fell in the medium-heavy category and were semi-skilled to skilled job classifications. Post-injury, Ms. Stoller stated that Mr. Pridgen's right upper extremity limitations in lifting, carrying, and reaching would affect his ability to perform essential work functions.

Ms. Stoller found that Mr. Pridgen sustained a significant loss of access to the open labor market due to his work injury and the permanent restrictions assigned by Dr. Rappe and Dr. Hovis. His dominant upper extremity injury and resulting restrictions precluded his ability to return to any of his pre-injury jobs. Employers would consider unacceptable

5

his difficulties performing daily living activities, inability to lift/carry, and problems with reaching/handling small objects and the use of his right arm for any length of time. He would be unable to comply with the basic demands of work as the jobs are usually and customarily performed in the labor market.

In Ms. Stoller's opinion, Mr. Pridgen sustained a significant if not total loss of access to the local labor market. She stated, "there are very limited if any job opportunities available to him that exist in significant numbers on a full-time basis within the competitive labor market in his present condition." She concluded Mr. Pridgen had suffered a total loss of access to the labor market.

Mr. Galloway identified the same work history and pre-injury work in the medium to heavy physical demand. He also noted that Mr. Pridgen's prior work was skilled.

Mr. Galloway discussed two unsuccessful post-injury attempts to return to work. He also noted that Mr. Pridgen had sent out multiple resumes for kitchen manager or cook positions and interviewed with some, but he was never offered a job. He additionally responded to Mr. Galloway's questioning in the interview that, if he only had the shoulder problem and related work restrictions, he believed he could perform cashier work.

Mr. Galloway noted that Mr. Pridgen reported significant medical problems before his work injury, including diabetes, chronic low back pain, sciatica/nerve damage in the right leg, neuropathy in both legs and feet, severe sleep apnea, and a right knee injury.

Post-injury, Mr. Galloway stated Mr. Pridgen was independent in personal hygiene, self-care, and dressing but required assistance with cutting his hair and trimming his beard. While he can perform simple food preparation, he requires his sons' assistance in the kitchen and performing household chores. He relies on his left arm for certain activities and suffers from preexisting and post-injury nonwork-related health conditions.

In Mr. Galloway's opinion, Mr. Pridgen has a ninety percent vocational disability based on Dr. Rappe and Dr. Hovis's permanent restrictions for the shoulder and considering his age, educational-vocational profile, and the local labor market. Mr. Galloway identified post-injury access to job titles including cashiers, unarmed guards, gate attendants, small product packagers, assemblers, inspectors/checkers, and conveyor operators/tenders. However, when Mr. Pridgen's nonwork-related medical conditions and resulting self-reported limitations are considered, Mr. Galloway's opinion was that Mr. Pridgen was likely unable to work.

**Motion for Summary Judgment**

Texas Roadhouse moved for summary judgment seeking a dismissal of Mr. Pridgen's case on grounds that his injury did not arise out of or in the course and scope of

his employment.[3]

It claimed no disputed material facts exist. Specifically, Texas Roadhouse alleged that, on or about July 23, 2019, Mr. Pridgen and a coworker were standing on the back dock. He was smoking a cigarette at time of his injury. Suddenly a possum ran out from under a nearby dumpster and startled him, resulting in him falling. He was done with tasks related to his work and was outside talking to a coworker at the time of the fall. His timecard showed that he clocked out at 11:00 p.m. that night, and his injury occurred at 11:40 p.m.

Based on these purported undisputed material facts, Texas Roadhouse asserted that Mr. Pridgen cannot prove that his injury arose out of or in the course of his employment. He was not working at the time of the incident or performing any activity for Texas Roadhouse.

Mr. Pridgen opposed the motion, arguing disputed material facts exist. He noted that the injury occurred on July 22 not July 23, 2019. He contended that he was waiting for his son to pick him up from work as he was hired without a driver's license, and this was an expected activity that Mr. Pridgen would have to wait for a ride home after his shift ended. Although the timecard noted a clock out time of 11:00 p.m., Texas Roadhouse has offered no proof that Mr. Pridgen clocked out at that time. Ms. Lay has clocked out employees, and she could not state whether she clocked Mr. Pridgen out. Mr. Pridgen cannot recall whether he clocked out that night or whether he was clocked out at the time of the injury. Mr. Pridgen disputed the time of the injury at 11:40 p.m., as Texas Roadhouse failed to produce the video footage with the alleged time of injury, and the exact time is unknown and disputed.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04 (2022). To prevail, Texas Roadhouse must do one of two things: (1) submit affirmative evidence that negates an essential element of Mr. Pridgen's claim, or (2) demonstrate that his evidence is insufficient to establish entitlement to benefits. Tenn. Code Ann. § 20-16-101 (2022); see also Rye v. Women's Care Ctr. of Memphis, MPLLC., 477 S.W.3d 235, 264 (Tenn. 2015). If the moving party meets its burden, the non-moving party must then "demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in [his favor]." Id. at *11.

For purposes of summary judgment, the parties disputed material facts regarding

---

[3] Texas Roadhouse filed the motion for summary judgment fewer than fifty days before trial. Allowing for a thirty-day response time, the motion hearing was set for the same day as the hearing. At the hearing, the Court took the motion under advisement.

the date and time of Mr. Pridgen's injury. To grant summary judgment would require the Court to weigh witness credibility, which it cannot do at this stage. *See Sherrer ex rel. Lilly S. v. Cleghorn*, 2018 Tenn. App. LEXIS 554, at *6-7 (Tenn. Ct. App. 2018) (trial court erred at the summary judgment stage by weighing the evidence and making determinations as to witness credibility).

For these reasons, the Court holds Texas Roadhouse failed to negate an essential element of Mr. Pridgen's claim or demonstrate that his evidence is insufficient to establish his entitlement to benefits. Therefore, the Court denies the motion.

## Findings of Fact and Conclusions of Law

At a Compensation Hearing, Mr. Pridgen must prove by a preponderance of the evidence that he is entitled to benefits. Tenn. Code Ann. § 50-6-239(c)(6).

### *Compensability*

Turning first to the threshold issue, the Workers' Compensation Law defines injury as an injury by accident arising primarily out of and in the course and scope of employment. Tenn. Code Ann. § 50-6-102(12).

The Tennessee Supreme Court long ago stated that the requirements that an injury "arise out of" and occur "in the course of" the employment are not synonymous. *McGauvran v. ATOS Syntel, Inc.,* 2021 TN Wrk. Comp. App. Bd. LEXIS 43, at *13-14 (Dec. 3, 2021). An injury occurs "in the course of" employment if it takes place while the employee was performing a duty he or she was employed to perform. Thus, the course of employment requirement focuses on the time, place, and circumstances of the injury."

In contrast, "arising out of" employment refers to causation. An injury arises out of employment when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. *Id.*

Here, the evidence showed that Mr. Pridgen had completed his work on July 22, 2019, when he went outside to smoke in the designated area. While smoking, a possum came from behind the dumpster and startled him, causing him to fall as he tried to escape. Smoking was permitted before, during, and after an employee's shift. Moreover, the designated smoking area was located outside near the dumpsters and grease barrels and often attracted possums and other wildlife. Mr. Pridgen and Ms. Lay both testified that Texas Roadhouse employed Mr. Pridgen, knowing that he did not have a driver's license and would be dropped off and picked up for work. Ms. Lay stated that "waiting for rides" was not unusual for several Texas Roadhouse employees.

8

In deciding these issues, the Court considers the premises liability rule and the personal comfort doctrine.

The Appeals Board most recently considered the premises liability rule in *Rowe v. Mitsubishi Motors North America, Inc.,* 2021 TN Wrk. Comp. App. Bd. LEXIS 15 (May 28, 2021). The Board concluded that longstanding authority, *Lollar v. Wal-Mart, Inc.,* 767 S.W.2d 143 (Tenn. 1989), remains good law under the Reform Act. *Id.* at *8-9. The Board cited the *Lollar* Court's conclusion that "[t]he 'course of employment' includes not only the time for which the employee is actually paid but also a reasonable time during which the employee is necessarily on the employer's premises while passing to or from the place where the work is actually done." *Id.* at *8.

The Appeals Board analyzed the personal comfort doctrine in *Jacobs v. Bridgestone Americas Tire Operations, LLC,* 2018 TN Wrk. Comp. App. Bd. LEXIS 4, at *11-15 (Feb. 7, 2018). Under the personal comfort doctrine, in general, injuries suffered by employees while on approved or authorized breaks are deemed to have arisen out of and occurred in the course and scope of employment. The Appeals Board held:

> [E]mployees who, within the time and space limits of their employment, engage in acts which minister to personal comfort do not thereby leave the course of employment unless the extent of the departure is so great that an intent to abandon the job temporarily may be inferred or unless the method chosen is so unusual and unreasonable that the conduct cannot be considered an incident of the employment.

*Id.* (internal citations omitted).

The Board clarified that activities that "minister to the personal comfort" of workers include "such incidental acts as eating, drinking, smoking, seeking toilet facilities, and seeking fresh air, coolness or warmth." *Id.* The rationale underlying this rule is that "[a]cts necessary to the life, comfort and convenience of an employee while at work are incidental to the employment and contribute to the furtherance of service." *Id.* (internal citations omitted). Therefore, "injuries that occur in the performance thereof are deemed to have arisen out of the employment." *Id.*

Texas Roadhouse contended these doctrines of premises liability and personal comfort do not apply to Mr. Pridgen's case because he was off the clock, had completed his tasks, and forty minutes had passed since he clocked out. It argued he was simply socializing with another coworker and waiting for his ride when the injury occurred.[4]

---

[4] Texas Roadhouse relied on *Higgins v. Big K. Food Market & Liquors,* 2014 TN Wrk. Comp. App. Bd. LEXIS 3 (Dec. 8, 2014) to support its position. In *Higgins,* the Appeals Board affirmed the trial court's denial of benefits at the interlocutory stage. While the case presented somewhat similar facts, the Board affirmed not on the merits of the trial court's decision but rather because the parties did not offer an adequate

9

Here, Ms. Lay acknowledged that smoking in the designated areas was allowed before, during, and after shifts. Moreover, the Court is not persuaded that Mr. Pridgen in fact clocked out at 11:00 p.m. or that the incident occurred forty minutes after he clocked out. Even if the incident occurred forty minutes after he clocked out, the Court finds the time reasonable and within the time of arriving or leaving under the premises liability rule. *See Carter v. Vol. App., Inc.*, 833 S.W.2d 492, 496 (Tenn. 1992) (an injury occurring fifty minutes before the employee's scheduled shift was within a reasonable interval before the shift and therefore in the course of employment).

Ms. Lay further confirmed that Mr. Pridgen was hired knowing he did not have his driver's license and would be picked up after each shift. She testified that "waiting for rides" was not unusual for several Texas Roadhouse employees. Moreover, the Court is not persuaded that Mr. Pridgen in fact clocked out at 11:00 p.m. or that the incident occurred forty minutes after he clocked out. "Employment includes not only the actual doing of the work, but a *reasonable margin of time* and space necessary to be used in passing to and from the place where the work is to be done." *Rowe,* at *9. Even if the incident occurred forty minutes after he clocked out, the Court finds the time reasonable and within the time of arriving or leaving under the premises liability rule.

Based on the evidence as a whole and applying the premises liability rule and the personal comfort doctrine, the Court holds Mr. Pridgen's injuries arose out of and in the course and scope of his employment.

*Impairment and Permanent Disability*

The Court next must determine Mr. Pridgen's degree of impairment. Three expert physicians offered opinions of permanent medical impairment.

Dr. Rappe, the treating panel-selected physician, initially assigned a three-percent impairment rating. After repeat MRI showing recurrent tears and revision surgery, Dr. Rappe increased his rating to seven percent. The opinion of the treating physician as to permanent impairment is presumed accurate but is rebuttable by a preponderance of the evidence. Tenn. Code Ann. § 204(k)(7). Dr. Rappe's seven-percent rating was confirmed by Dr. Bolt, the MIRR physician, whose opinion is also presumed to be the accurate impairment rating. However, that the MIRR physician's presumption may only be rebutted by clear and convincing evidence. Tenn. Code Ann. § 204(d)(4).

In contrast, Dr. Hovis, the employer's examination physician, assigned a six-percent impairment rating based on the loss of range of motion.

---

record on appeal. *Id.* at *8-9. Texas Roadhouse also cited *Cox v. Sonic Automotive*, 2018 TN Wrk. Comp. LEXIS 52 (May 11, 2018), which is persuasive authority only and not binding on this Court.

The Court holds that Dr. Hovis's opinion failed to rebut the presumption of correctness afforded Drs. Rappe and Bolt by the preponderance of the evidence or a clear and convincing standard. Dr. Hovis agreed that differing opinions were reasonable by two physicians and gave no explanation for why his opinion was more accurate. Moreover, the evidence does not support Texas Roadhouse's contention that Mr. Pridgen suffered a new injury during his brief later employment. Thus, the Court concludes Mr. Pridgen sustained a seven-percent permanent impairment rating.

The final issue is the extent of Mr. Pridgen's permanent disability. When an employee's disability from a work-related injury is found to be permanent, the employee is entitled to permanent disability benefits based on the degree of vocational disability caused by the injury. *Braden v. Mohawk Ind., Inc.*, 2022 TN Wrk. Comp. App. Bd. LEXIS 11, at *21-22 (Mar. 1, 2022) (internal citations omitted). An employee may be found permanently and totally disabled when the work injury "totally incapacitates the employee from working at an occupation that brings the employee an income." *Id.*; Tenn. Code Ann. § 50-6-207(4)(B).

In assessing an employee's permanent vocational disability caused by a work injury, the court can consider several factors, including the employee's medical impairment, job skills, education, age, training, "job opportunities in the immediate and surrounding communities, and the availability of work suited for an individual with that particular disability." *Id.* (internal citations omitted). An employee's own assessment of his or her overall physical condition, including the ability or inability to return to gainful employment, "is competent testimony that should be considered." *Id.* (internal citations omitted). The extent of an employee's vocational disability is a question of fact to be determined from both lay testimony and medical evidence. *Id.*

Mr. Pridgen argued his work injury and related permanent restrictions have resulted in his inability to return to work, leaving him permanently and totally disabled. Texas Roadhouse disagreed.

Mr. Pridgen is fifty years old with a GED. He worked in the construction and restaurant industries with physical demands ranging from medium to heavy until his work injury. He sustained a seven-percent impairment and has permanent restrictions of no lifting greater than five or ten pounds and no overhead work. Post injury, his permanent restrictions limit him to sedentary to light work in unskilled jobs. Additionally, he suffers from multiple other medical conditions unrelated to his work injury, which did not prevent him from working before his work injury.

In Ms. Stoller's opinion, Mr. Pridgen sustained a significant if not total loss of access to the local labor market due to his work injury and permanent restrictions. She stated, "there are very limited if any job opportunities available to him that exist in significant numbers on a full-time basis within the competitive labor market in his present

11

condition." She concluded Mr. Pridgen had suffered a total loss of access to the labor market.

Mr. Galloway, however, testified that Mr. Pridgen has a ninety percent vocational disability based on Dr. Rappe's and Dr. Hovis's permanent restrictions for the shoulder and considering his age, educational-vocational profile, and the local labor market. Mr. Galloway identified post-injury access to job titles including cashiers, unarmed guards, gate attendants, small product packagers, assemblers, inspectors/checkers, and conveyor operators/tenders. However, when Mr. Pridgen's nonwork-related medical conditions and resulting self-reported limitations are considered, Mr. Galloway's opinion was that Mr. Pridgen was likely unable to work.

The Court concludes the preponderance of the evidence shows Mr. Pridgen is permanently and totally disabled from full-time work. The Court considered his medical impairment, limited transferable job skills, GED, his age, lack of training in traditional sedentary jobs, and the lack of job opportunities in the local labor market available within his restrictions.

*Benefits*

Therefore, the Court holds Mr. Pridgen is entitled to weekly benefits from February 25, 2022, the date of maximum medical improvement, until he is eligible for full benefits in the Old Age Insurance Benefit Program under the Social Security Act. Tenn. Code Ann. § 50-6-207(4)(A)(i).

Further, the Court considers whether Mr. Pridgen's attorney is entitled to attorney's fees under Tennessee Code Annotated section 50-6-226(a)(1). The Court may award attorney's fees not to exceed twenty percent of the first 450 weeks of an award of permanent total disability, provided the fees are paid by the employee.

The Court finds that this case required significant time and expertise on the part of both counsel. A fee of twenty percent is statutorily authorized and customary in cases brought before this Court. Therefore, under Tennessee Code Annotated sections 50-6-207(4)(A)(ii)(a) and 50-6-207(4)(A)(iii), the Court commutes twenty percent of the permanent total disability benefits for Mr. Pridgen's attorney's fee in the amount of $28,024.20.

Additionally, Tennessee Code Annotated section 50-6-207(4)(A)(ii)(c) states:

After the total amount of the commuted lump sum is determined, the amount of the weekly disability benefit shall be recalculated to distribute the total remaining permanent total benefits in equal weekly installments beginning with the date of entry of the order and terminating on the date the employee's

disability benefits terminate pursuant to subdivision (4)(A)(i).

Mr. Pridgen will be eligible for full benefits in the Old Age Insurance Benefit Program on May 11, 2040, when he turns sixty-seven. The period of February 26, 2022, through May 11, 2040, totals 949 weeks and six days, which at his compensation rate totals $295,766.51. Reducing that amount by the attorney fee of $28,024.20 yields an adjusted total benefit of $267,742.31, which divided by 949 weeks equals an adjusted weekly compensation rate of $282.13. Texas Roadhouse shall pay Mr. Pridgen's permanent total disability benefits at this rate. It shall also pay accrued benefits for the period of February 26, 2022, through the entry of this order in a lump sum.

**IT IS, THEREFORE, ORDERED as follows:**

1.  Texas Roadhouse shall provide Mr. Pridgen with medical treatment for his work injuries under Tennessee Code Annotated section 50-6-204. Dr. Rappe remains the authorized treating physician.

2.  Texas Roadhouse shall pay Mr. Pridgen a lump sum of eighty weeks of benefits and six days, totaling $22,812.20, in satisfaction of the benefits accruing between February 26, 2022, and the date of entry of this order.

3.  Texas Roadhouse shall pay ongoing permanent total disability benefits on a weekly or bi-weekly basis until Mr. Pridgen is eligible for full Old Age Social Security retirement benefits, and his permanent total disability award is paid in full.

4.  Mr. Pridgen's counsel shall be paid a twenty-percent attorney fee, or $28,024.20, in a lump sum.

5.  Texas Roadhouse shall pay the $150.00 filing fee within five business days of entry of this order, for which execution may issue if necessary.

6.  Texas Roadhouse shall file a Statistical Data Form (SD-2) within ten business days of this order becoming final.

7.  Unless appealed, this order becomes final in thirty days.

**ENTERED September 14, 2023.**

JUDGE PAMELA B. JOHNSON
Court of Workers' Compensation Claims

13

## APPENDIX

Technical Record:
1. Petition for Benefit Determination, July 28, 2020
2. Petition for Benefit Determination for Settlement Approval Only, May 11, 2022
3. Petition for Benefit Determination, June 24, 2022
4. Dispute Certification Notice, August 18, 2022
5. Employee's Notice of Service of Offer of Judgment
6. Employee's Notice of Intent to Use C-32 of Dr. Rappe and MIRR Report
7. Employer's Objection to Use of C-32
8. Dispute Certification Notice, May 23, 2023
9. Employee's Additional Disputed Issues
10. Employer's Motion for Summary Judgment and
11. Employer's Memorandum of Law and Statement of Undisputed Facts
12. Employee's Pre-Hearing Brief
13. Joint Pre-Compensation Hearing Statement
14. Employer's Witness and Exhibit List
15. Employer's Brief
16. Employee's Response to Employer's Motion for Summary Judgment, Memorandum of Law, and Statement of Undisputed Facts

Exhibits:
1. Employee's Resumé
2. Job Description
3. Vocational Report of Dana Stoller
4. Vocational Report of Michael Galloway
5. Causation Letter of Dr. Matthew Rappe (Taken Under Advisement)[5]
6. Medical Records of Broadway Neck and Spine
7. Affidavit of Employee's Attorney
8. Table of Contents of Medical Records and Depositions
   a. Form C-32 of Dr. Matthew Rappe
   b. MIRR Report of Dr. Patrick Bolt
   c. Deposition Transcript of Dr. W. David Hovis
   d. MRI Reports of August 22, 2019, August 21, 2020, & July 20, 2021
   e. Medical Records and Work Restrictions of Dr. Matthew Rappe
   f. Medical Records of North Medical Center
   g. Physical Therapy Records of Benchmark Physical Therapy
9. Portions of Employee's Deposition Transcript
10. Return to Work Note, March 3, 2023

---

[5] Texas Roadhouse objected to the admissibility of the causation letter as a medical record. The Court finds the causation letter was sent to Dr. Rappe by Texas Roadhouse and relied upon in continuing Mr. Pridgen's medical and temporary disability benefits.

## CERTIFICATE OF SERVICE

I certify that a copy of the Compensation Order was sent as shown on September 14, 2023.

| Name | Mail | Email | Service sent to: |
|------|------|-------|------------------|
| Peter Frech Employee's Attorney | | X | pfrech@forthepeople.com |
| Tiffany B. Sherrill, Employer's Attorney | | X | tbsherrill@mijs.com |

PENNY SHRUM, COURT CLERK
wc.courtclerk@tn.gov

15



<u>Compensation Order Right to Appeal</u>:

If you disagree with this Compensation Order, you may appeal to the Workers' Compensation Appeals Board. To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims *within thirty calendar days* of the date the Compensation Order was filed. When filing the Notice of Appeal, you must serve a copy upon the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal. The Court Clerk will prepare the technical record and exhibits for submission to the Appeals Board, and you will receive notice once it has been submitted. If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee. A licensed court reporter must prepare a transcript, and you must file it with the Court Clerk *within fifteen calendar days* of filing the Notice of Appeal. Alternatively, you may file a statement of the evidence prepared jointly by both parties *within fifteen calendar days* of filing the Notice of Appeal. The statement of the evidence must convey a complete and accurate account of the testimony presented at the hearing. The Workers' Compensation Judge must approve the statement of the evidence before the record is submitted to the Appeals Board. If the Appeals Board must review testimony or other proof concerning factual matters, the absence of a transcript or statement of the evidence can be a significant obstacle to meaningful appellate review.

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties. You have *fifteen calendar days* after the date of that notice to file a brief to the Appeals Board. *See the Rules governing the Workers' Compensation Appeals Board on the Bureau's website*

**If neither party timely files an appeal with the Appeals Board, the trial court's Order will become final by operation of law thirty calendar days after entry. Tenn. Code Ann. § 50-6-239(c)(7).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



## NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____    ☐ Motion Order filed on _____

☐ Compensation Order filed on_____    ☐ Other Order filed on_____

issued by Judge _____.

## Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

## Parties

**Appellant(s)** (Requesting Party): _____    ☐ Employer ☐ Employee

Address: _____    Phone: _____

Email: _____

Attorney's Name: _____    BPR#: _____

Attorney's Email: _____    Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee
Appellee's Address: _____ Phone: _____
Email: _____
Attorney's Name: _____ BPR#: _____
Attorney's Email: _____ Phone: _____
Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

## CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*[Signature of appellant or attorney for appellant]*



**Tennessee Bureau of Workers' Compensation**
**220 French Landing Drive, I-B**
**Nashville, TN 37243-1002**
**800-332-2667**

## AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived. The following facts support my poverty.

1. Full Name: _____ 2. Address: _____

3. Telephone Number: _____ 4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

6. I am employed by: _____

My employer's address is: _____

My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | | |
|---|---|---|---|
| AFDC | $ _____ per month | beginning | _____ |
| SSI | $ _____ per month | beginning | _____ |
| Retirement | $ _____ per month | beginning | _____ |
| Disability | $ _____ per month | beginning | _____ |
| Unemployment | $ _____ per month | beginning | _____ |
| Worker's Comp. | $ _____ per month | beginning | _____ |
| Other | $ _____ per month | beginning | _____ |

9. My expenses are:

Rent/House Payment $ _____ per month    Medical/Dental  $ _____ per month

Groceries        $ _____ per month    Telephone      $ _____ per month

Electricity      $ _____ per month    School Supplies $ _____ per month

Water            $ _____ per month    Clothing       $ _____ per month

Gas              $ _____ per month    Child Care     $ _____ per month

Transportation   $ _____ per month    Child Support  $ _____ per month

Car              $ _____ per month

Other            $ _____ per month (describe: _____ )

10. Assets:

Automobile              $ _____        (FMV) _____

Checking/Savings Acct.  $ _____

House                   $ _____        (FMV) _____

Other                   $ _____        Describe: _____

11. My debts are:

| Amount Owed | To Whom |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

**I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.**

_____
APPELLANT

Sworn and subscribed before me, a notary public, this

_____ day of _____, 20_____.

_____
NOTARY PUBLIC

My Commission Expires: _____